CHARLES NEATHERY

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed April 18, 1907.*

1. CRIMINAL LAW—*correct practice where only error is in the verdict, judgment and sentence.* If the only error in a trial is in the verdict, judgment and sentence, which fix the term of imprisonment in the penitentiary instead of providing for an indeterminate term in the State reformatory, the proper practice is to remand the cause with directions to enter a proper judgment without another trial.

2. SAME—*evidence of threats by deceased are admissible in a murder trial.* Upon the trial of one accused of murder whose plea is self-defense, proof of threats by the deceased against the accused, made to third persons before the fatal affray, are admissible, even though not shown to have been communicated to the accused.

3. SAME—*when action of court on motion for new trial is error.* Where counsel for accused, within fifteen minutes after verdict is returned, presents a written motion for a few hours' time to prepare a motion for new trial and argue the same, it is error for the court to overrule the motion, enter an order providing that a motion for new trial, with reasons, might thereafter be filed *nunc pro tunc* as of the day of the verdict, and then, without learning the reasons to be urged or hearing counsel in support of the motion, immediately overrule motions for new trial and in arrest of judgment, sentence the prisoner, enter final judgment and adjourn court.

4. SAME—*when motion for new trial cannot be overruled before hearing proof.* A motion for new trial cannot be overruled before the consideration of proof offered with or upon the hearing of the motion, where one of the reasons assigned in support of the motion is the alleged falsity of the answers made by one of the jurors when being examined as to his competency.

WRIT OF ERROR to the Circuit Court of Fayette county; the Hon. JAMES W. CRAIG, Judge, presiding.

E. B. SPURGEON, THOMAS M. JETT, and ALBERT & MATHENY & ROE, for plaintiff in error.

WILL P. WELKER, State's Attorney, F. M. GUINN, and L. V. HILL, for the People.

Mr. CHIEF JUSTICE SCOTT delivered the opinion of the court:

At the August term, 1906, of the circuit court of Fayette county, Charles Neathery, the plaintiff in error, was found guilty of manslaughter under an indictment charging him with murder, and his punishment was fixed by the verdict of the jury at imprisonment in the penitentiary for a term of six years. After overruling a motion for a new trial and a motion in arrest of judgment the court rendered judgment on the verdict and sentenced Neathery to imprisonment in the penitentiary at Chester for a term of six years. The cause has been brought to this court by writ of error.

Plaintiff in error admitted that on the night of January 31, 1906, he shot and killed Curtis Kirk, but endeavored to show that in so doing he acted in self-defense. The greater portion of the evidence was directed to determining whether plaintiff in error was, under the law of self-defense, justified in shooting the deceased.

The attorneys who file the brief for defendant in error state that they are not satisfied with the abstract filed by plaintiff in error, but they have not filed a further abstract. Under these circumstances the abstract on file will be regarded as sufficient to enable us to consider and determine the errors assigned. (Rule 14, 204 Ill. 13.)

Neathery and Kirk were, at the time of the killing, each about nineteen years of age. Kirk, however, was somewhat taller and from twenty to thirty pounds heavier than Neathery. They had not been on friendly terms with each other for several weeks. According to the testimony of Neathery, the first trouble between them occurred while they were attending church. Neathery was sitting with his cousin, a girl twelve years of age. Kirk was sitting immediately behind them. The latter amused himself by pulling the girl's hair. Neathery told him not to do that, in response to which Kirk said, "God damn you, if you will go out of

the house we will settle it." Some time thereafter, and a week or two before the shooting, the witness Wilson heard Neathery, in talking with Kirk over the telephone, say to him that he (Neathery) was enough for him (Kirk) any time or place.

The most serious altercation between the two, however, before that which resulted in Kirk's death, occurred about a week before the shooting, at a place known as Greer's corner. Neathery arrived at the corner before Kirk, and was standing on the east side of the road, near the fence, talking with two boys, when Kirk rode up on a horse. He stopped on the west side of the road, and, after talking to some friends, said, "I want to see this fellow over here," and rode over to plaintiff in error. The witnesses who were present at this time differ as to what was thereafter said by the respective parties. The great weight of the evidence is to the effect that Kirk, after dismounting from his horse and removing his overcoat, first addressed plaintiff in error, saying, "I heard you was going to whip me." Neathery replied, "I heard you said you was going to whip me the first time you met me." Kirk said it was a lie, and remarked, "Maybe you think I can't whip you," to which Neathery replied, "I don't know whether you can or not." Thereupon Kirk drew back his fist as though he intended to hit Neathery, but did not strike him. Plaintiff in error walked over to his father, who was standing in the road, and asked him for a knife. Kirk did not follow him. The father refused to let Neathery have a knife and asked Kirk to go home, saying that they did not want any trouble there. Kirk said, "By God, this is a public highway, and I would like to see you make me." A few minutes later, however, he mounted his horse and rode off, inviting plaintiff in error down the road. Plaintiff in error refused to follow Kirk, saying he did not want to fight but that he (Neathery) would see him some other time, to which Kirk replied, "Yes, by God, I will see you, and see you proper." On the same

day Kirk asked John Alexander to tell plaintiff in error that if he ever caught plaintiff in error out he was going to "whip hell out of him." Alexander delivered the message.

On the night of January 31, 1906, the plaintiff in error, with his cousin, the young girl mentioned above, attended revival services at Hurricane church, in Fayette county. He arrived at the church about seven o'clock. After his cousin had gone into the building he met Andrew Walker, a boy nineteen years of age, outside the church, and the two went across the road from the church to a well to get a drink. While at the well plaintiff in error showed Walker a revolver, and told him that he and Kirk had been having a little trouble, and said, "I am not afraid of him." Walker said, "I wouldn't use a gun until I had to," and defendant replied, "I wouldn't either."

The entrance to the church was on the north side of the building. The pulpit was on the south side. An aisle led from the entrance to the pulpit, and wooden seats with straight backs extended east and west on each side of the aisle to the walls of the church. Plaintiff in error and Walker entered the church and took seats on the east side of the aisle, near the entrance. A few minutes later Kirk and Charles Henderson came in and took seats immediately in front of them. A short time thereafter Neathery asked Walker to go outside with him to see whether his horse, which he had driven that night and had tied to a hitch-rack near the church, was all right. Shortly after Neathery and Walker had gone out Kirk told Henderson that Neathery had rubbed against him as he went out, and that if he (Kirk) didn't go out Neathery would think he was afraid of him. Kirk and Henderson then left the church. They stopped just outside the door long enough to put on their overcoats. In the meantime Neathery and Walker had gone around the north-west corner of the church and had met Charles Pugsley and Alex Blankenship, and these four were standing on the west side of the church, a few feet south

227—8

of the north-west corner, when Kirk and Henderson came out of the church. The two latter walked out a few feet north of the church and saw the other four boys standing west of the church. Kirk and Henderson then turned and walked towards the north-west corner of the church, and when they had reached a point about ten feet distant from the other boys, Kirk said, "Boys, you needn't be putting things in your pockets," or words to that effect. Someone replied that they were not putting anything in their pockets. Kirk then asked Pugsley if he didn't give Neathery a gun. Pugsley answered that he did not. He then asked Neathery if Pugsley gave him a gun, and Neathery answered that he did not. Kirk then said to plaintiff in error, "I heard you was going to whip me." Neathery replied, "No, I didn't say so; I heard you was going to give me a whipping." Kirk replied, "I didn't say I was going to whip you; I said I could whip you." Neathery said, "That is what the other fellows told me," and Kirk responded, "You tell the other fellows they are God damn liars, and if you say it you are one too." Kirk then advanced towards Neathery, who was standing close to the west wall of the church, and the latter put his right hand in or upon his hip pocket. Kirk told plaintiff in error to take his hand out of his pocket, or to put up that gun, and Neathery replied that he did not have to. Kirk walked up, saying he would slap Neathery open-handed, or would slap him through the wall, and caught Neathery by the shoulder or around his neck with his left arm and pushed him up against the side of the building.

There is an irreconcilable conflict in the evidence given by the eye-witnesses as to what then occurred. After the trouble had started two boys by the name of Browning came out of the church and joined Kirk and Henderson. The Browning boys and Henderson swear that no blows were struck by either,—that there was merely a scuffle when Neathery fired the shot. Plaintiff in error, Walker, Pugsley and Blankenship, however, all swear that Kirk had

struck Neathery on the head several times and pushed or knocked him to his knees, or to a position in which his head was not higher than if he had been on his knees, when the shot was fired. Walker was one of the witnesses called by the People, and it was shown that the Brownings and Henderson each testified at the preliminary examination, and each of them stated, in substance, that he did not know whether Kirk struck Neathery before the shot was fired. Plaintiff in error testified that Kirk caught him around the neck and took something from his pocket that glistened, and repeatedly struck and cut him upon the head with it. He is corroborated in this statement by Pugsley, while Blankenship swore that he saw something in or upon Kirk's hand which glistened when the blows were struck. At the time of the shooting Kirk had a ring with a set in it on his finger, and it is the theory of the prosecution that it was the ring which the witnesses saw glisten upon Kirk's hand. Witnesses who examined Neathery's head shortly after the affray, and who seem to have testified frankly and fairly, swear that there were several lumps on his head, each the size of a walnut, and that there was a cut in his scalp two and one-half inches in length and extending to the bone, just above his left ear, and that he bled profusely from this gash. After Kirk was shot he immediately ran away a few feet, saying Neathery had shot him. He was taken to a house near by, where he died the following day. Neathery went to his home and the same night rode to the residence of an uncle a few miles away, where he remained for two days. He then went to Vandalia and surrendered himself to the sheriff of Fayette county.

The evidence showed that plaintiff in error, at the time of the trial, was nineteen years of age. The court, of its own motion, instructed the jury that if they found the defendant guilty of manslaughter they should fix his punishment at imprisonment in the penitentiary for his natural life, or for any number of years not less than one year.

The jury found the defendant guilty of manslaughter, determined that he was nineteen years of age, and fixed his punishment at imprisonment in the penitentiary for six years. The judgment and sentence of the court followed the verdict.

It is conceded by counsel for the People that the verdict of the jury and the judgment and sentence of the court are erroneous in fixing the punishment at imprisonment in the penitentiary; that the jury should not have fixed the punishment and that the court should not have sentenced plaintiff in error to confinement in the penitentiary at all but should have sentenced him to the reformatory for an indeterminate period, and that for the error of the court in sentencing plaintiff in error to confinement in the penitentiary this cause must be reversed and remanded; but it is contended by the State that it should not be remanded for a new trial.

If the record were otherwise free from error, we agree that, following the practice in *Henderson* v. *People,* 165 Ill. 607, the judgment should be reversed and the cause remanded with directions to the court to enter the proper judgment, and in that event a new trial would be unnecessary; but we think that other prejudicial error intervened in the trial of the case which makes it impossible to pursue this course.

After the altercation at Greer's corner Kirk rode away in the company of Wade Dodson, who was a witness on the trial. For the purpose of showing that Kirk made threats of personal violence against him, plaintiff in error asked Dodson what Kirk said to him at the end of the lane when he rode away from Greer's corner. The court sustained an objection to the question. Plaintiff in error also sought to show by Fred Pugsley that on an occasion two days before the shooting, when he (Pugsley) met Kirk at Hurricane church, the latter made like threats against Neathery. The court refused to allow the proof to be made. It is not

claimed that any of these threats were communicated to Neathery before the fatal affray, but evidence that they were made was nevertheless admissible. *Campbell* v. *People,* 16 Ill. 17; *Siebert* v. *People,* 143 id. 571.

As to the proof which plaintiff in error sought to make by Dodson, it is stated that his testimony would not have shown any threat made by Kirk. This statement finds no support in the abstract. The court could not know that the witness' testimony would not show that threats were made without in some manner ascertaining what that testimony would be, and the court did not in any way learn what Dodson would have answered. Nothing whatever is said in defense of the ruling which excluded Pugsley's testimony. The court erred in sustaining the objections to the questions propounded to Dodson and Pugsley.

Upon the coming in of the jury a controversy arose as to whether the motion for a new trial should be immediately presented and disposed of. Plaintiff in error then, within fifteen minutes after the return of the verdict, made his motion, in writing, for three or four hours' time in which to examine the instructions, to prepare a motion for a new trial and to prepare to argue the motion. The court did not allow this motion, but entered an order providing that a motion for a new trial, stating reasons, might thereafter be prepared and might be filed *nuc pro tunc* as of the day on which the verdict was returned. The court then immediately, without learning what reasons would be urged in support of the motion for a new trial and without hearing counsel in support of such a motion, overruled the motion for a new trial, overruled a motion in arrest of judgment, sentenced Neathery to the penitentiary, entered final judgment and adjourned court. The plaintiff in error thereafter filed his motion for a new trial, stating his reasons in accordance with the order, and now complains of the action of the court in not allowing his request for time in which to prepare his motion for a new trial before that

motion was overruled, and assigns as error the overruling of the motion last mentioned.

One of the reasons upon which the motion for a new trial was based was the alleged falsity of the answers made by one of the jurors while he was being examined as to his competency. Whether such answers were false could only be determined by the court upon consideration of proof offered with, or upon the hearing of, the motion. That question could not properly be decided by an order overruling the motion before the motion was actually made.

As another ground for a new trial, it was stated that the verdict was contrary to the evidence, and that proposition is insisted upon in this court. As the case will be submitted to another jury we say nothing as to the merit of this contention. In determining such an assignment of error we give great weight to the fact that the judge of the trial court, who saw and heard the witnesses and enjoyed opportunities to determine their credibility which we do not have, has reached the conclusion that the evidence justifies the verdict. If the motion for a new trial is overruled before the grounds therefor are known to the trial judge, his approval of the action of the jury is without any real significance. He could not know whether he was determining that the verdict was not contrary to the evidence when he did not know whether the motion for a new trial would raise that question.

We think the request of plaintiff in error for time in which to prepare his motion for a new trial was a reasonable one, and that he should have been given the time asked before the motion for a new trial was passed upon. When the motion was presented or the reasons therefor stated the court could have determined whether he desired to hear argument and could have indicated what further steps should be taken.

The judgment of the circuit court will be reversed and the cause remanded to that court for a new trial.

*Reversed and remanded.*